IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Raymond Gibson, Jr.,

     Plaintiff,

    v.                       Case No. 2:05-cv-888

The Shelly Company,

     Defendant.

<u>OPINION AND ORDER</u>

This is an employment discrimination action filed by plaintiff Raymond Gibson, Jr., against his former employer, defendant Shelly Company. Plaintiff, an African-American, alleges that he was terminated by defendant in 2003, 2004, and 2005 on the basis of his color and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, <u>et</u> <u>seq</u>., 42 U.S.C. §1981, and Ohio Revised Code §4112.02. He also alleges that his terminations in 2004 and 2005 were in retaliation for filing discrimination complaints with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"). The complaint also includes a claim under Ohio law for the negligent and/or intentional infliction of emotional distress.

This matter is before the court on the defendant's motion for summary judgment. The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the

nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). <u>See</u> <u>also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that <u>Liberty Lobby</u>, <u>Celotex</u> and <u>Matsushita</u> effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. <u>Street v. J. C. Bradford & Co.</u>, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in <u>Street</u> identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. <u>Id</u>. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Id</u>. (quoting <u>Liberty Lobby</u>, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. <u>Id</u>. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'"

Id. (quoting Matsushita, 475 U.S. at 586). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

I. History of the Case

The defendant company engages in the repaving of asphalt roadways in Ohio. The work is seasonal, and runs from approximately May 1st to November 1st. Defendant obtains its labor force, such as laborers and heavy equipment operators, by contacting the various union halls around the state. The unions then send the required number of employees using the union's list of available employees. Plaintiff's union, the International Union of Operating Engineers, Local 18, is a union which sends workers to defendant for employment on defendant's job sites.

Defendant's construction crews work under potentially hazardous circumstances because they work on roadways where motorists frequently pass through at high rates of speed. Each employee is given a copy of defendant's Manual of Safety Practices and Procedures ("the Safety Manual"). Defendant's Ex. C. Violations of the safety policies are classified as "serious" or "other than serious." Ex. C, Section X. "Serious" violations are those where there is a substantial probability that death or serious physical harm could result from the violation and the employee knew or should have known of the hazard. "Other than serious" violations are those which are related to job safety and health but probably would not cause death or serious physical harm.

Two "other than serious" violations equal one "serious" violation. If an employee receives two "serious" violations within one year, his employment will be terminated.   The Safety Manual further states that "an employee's supervisor after consultation with the appropriate general supervisor and the Safety Committee has the discretion to discharge the employee after any safety violation." Ex. C., Section X.

In May of 2003, plaintiff was employed by defendant as a roller operator.  As a roller operator, plaintiff was responsible for operating a dual drum roller consisting of two large rollers and a seating and control area, equipment which weighed approximately ten tons.  Plaintiff's job was to use the roller to smooth the asphalt after another machine placed the asphalt onto the roadway.  The roller is approximately sixteen feet long, and due to its weight, it normally takes at least three feet to stop. Defendant's Ex. I, Aff. of Scott Cooperrider.

On May 13, 2003, Mr. Cooperrider observed plaintiff drive the roller off of the new asphalt surface and into the moving traffic lane on three occasions.  Drivers passing through the work area had to apply their brakes in order to avoid a collision with the roller.   Mr. Cooperrider reported his observations to his supervisor.

On May 14, 2003, Deborah Freeze, a female crew member, reported to Mr. Cooperrider that plaintiff had made sexually-oriented remarks to her and had engaged in other conduct which made her feel uncomfortable working near plaintiff.  Mr. Cooperrider conveyed this complaint to Candace Gales, defendant's EEO officer. Ms. Gales came to the work site and interviewed Ms. Freeze.  She

4

informed defendant's counsel about the harassment complaints, and counsel stated that due to the safety violations and the harassment complaints, plaintiff should be removed from the job until the investigation was completed.  While Ms. Gales' investigation was pending, defendant decided that plaintiff's employment should be terminated due to plaintiff's serious safety violations and the sexual harassment complaints, and plaintiff's employment was terminated on May 16, 2003.  Defendant's Ex. F, Gales Aff. and Report of July 25, 2003.

Ms. Gales continued her investigation after plaintiff's termination, and concluded that plaintiff's conduct with Ms. Freeze and another female employee violated the defendant's prohibition against creating a sexually hostile work environment.  According to her report, Ms. Freeze reported that plaintiff engaged in several conversations with her which included sexual innuendos and unwelcome references to her body parts.  In his conversations with Ms. Freeze, plaintiff, using off-color and hostile language, referred to a second female employee, stating that he would like to fight this other employee if she could come down off of the equipment.  The second female employee reported that plaintiff threatened her with his actions and mannerisms, such as maneuvering his equipment in her direction as if to indicate he was going to run his roller into her equipment.

On May 19, 2003, plaintiff filed a charge of discrimination with the OCRC.  Defendant's Ex. J.  On February 19, 2004, the OCRC issued a decision finding that no probable cause existed to support the claim that plaintiff was discharged because of his race, and his charge was dismissed.  The decision stated that the records

5

before the OCRC showed that defendant terminated plaintiff's employment after receiving complaints from a female employee concerning sexual harassment, and that defendant has terminated Caucasian employees for failing to comply with its policies concerning harassment. The decision further stated that the testimony presented to the OCRC failed to substantiate that plaintiff's race was a factor in his discharge. Defendant's Ex. K. On May 21, 2004, the EEOC issued a right to sue letter. Defendant's Ex. L.

Plaintiff also filed a grievance through his union concerning his termination. When defendant denied the grievance, the matter proceeded to an arbitration hearing on March 18, 2004. In June of 2004, while the arbitration was still pending, the union referred plaintiff to defendant's job site in Zanesville, Ohio. The day after plaintiff started on the job, David Gentil, the job foreman, learned that plaintiff was not eligible to work for defendant due to the pending arbitration. Defendant's Ex. M, Gentil Aff. Mr. Gentil advised plaintiff that he would have to return to the union hall to obtain another assignment.

On August 16, 2004, plaintiff filed a complaint with the OCRC alleging that he was discharged in retaliation for filing a previous charge of discrimination. On April 14, 2005, the OCRC issued a decision finding no probable cause to believe that defendant terminated plaintiff in retaliation for filing the earlier charge, and dismissing his charge. Defendant's Ex. N. The decision stated that there was no evidence to substantiate plaintiff's allegations of retaliation, and specifically noted the statement of William Fadel, counsel for the union, that there was

6

no evidence of race discrimination or retaliation during the arbitration. On July 5, 2005, the EEOC issued a right to sue letter adopting the findings of the OCRC in regard to the charge. Defendant's Ex. O.

On December 4, 2004, Dr. David M. Pincus, the arbitrator in plaintiff's grievance matter, issued his decision. Defendant's Ex. P. The arbitrator concluded that under the terms of the collective bargaining agreement, the defendant was required to show just cause for plaintiff's termination. The arbitrator also noted that the defendant was required to produce evidence "sufficient to convince a reasonable mind of guilt." The arbitrator applied the standard applicable to hostile work environment claims under Title VII in evaluating the sexual harassment claims against plaintiff. He noted that the investigation into the alleged harassment was not completed prior to plaintiff's termination, and concluded that the evidence did not warrant terminating plaintiff for sexual harassment. The arbitrator also concluded that just cause did not exist to terminate plaintiff's employment on the basis of a safety violation because plaintiff had no previous disciplinary record, because the termination notice failed to state that a serious safety violation had occurred, and because Cooperrider merely told plaintiff that entering into the traffic lane was unsafe and inappropriate and did not warn him that if he did it again he would be fired. The arbitrator ordered that plaintiff be reinstated with full back pay, benefits and seniority to May 16, 2003. The arbitrator further ordered that plaintiff's record reflect a reprimand for operating his roller in active traffic, with an admonishment that further conduct of a similar nature would result

7

in more serious discipline.  The arbitrator's decision, including the arbitrator's summary of the union's position, makes no mention of any issues concerning race discrimination as a factor in plaintiff's termination.

On May 10, 2005, plaintiff was sent by the union to work on a road paving project for the defendant.  Late that afternoon, plaintiff was operating his roller behind a paver machine on which Richie Boring, the job foreman, was riding.  Defendant's Ex. Q, Boring Aff.  Mr. Boring observed plaintiff drive the roller so that it approached the back end of the paver, slowed down, then picked up speed, coming within inches of the platform on which Mr. Boring was standing.  Mr. Boring stated that if the roller had come a few inches closer, He could have been killed.  Mr. Boring brought this incident to the attention of a member of the Safety Department.  On May 11, 2005, crew members reported to Mr. Boring that plaintiff had driven the roller off of the road several times, and that on one of these occasions, plaintiff had almost driven the roller into a ditch.  Mr. Boring notified Safety Director Denny Paul, who dispatched Safety Representative Drake Prouty to the scene. Defendant's Ex. D, Paul Aff.

On May 11-12, 2005, Mr. Prouty conducted an investigation of the alleged safety violations committed by plaintiff.  Defendant's Ex. E, Prouty Aff. and Report.  Mr. Prouty gathered information from witnesses in regard to the May 10th incident.  Matt Shaeffer reported that on the morning of May 10th, plaintiff appeared to be having a hard time keeping awake, and he was observed dozing off between trucks.  Mr. Shaeffer stated in his affidavit that plaintiff's roller was six inches away from hitting the paver or a

member of the crew. According to his affidavit, Mr. Boring reported that at approximately 3:00 p.m., he observed plaintiff come within three inches of coming over the top of the screed. In an affidavit, Bryan Boyer stated that he observed plaintiff stop close to the back of the paver. Plaintiff shook his head as if to try to wake himself up, and then rolled back the other way. Mr. Boyer stated that if someone had been standing on the right side of the screed and plaintiff had come a few feet closer, someone might have been crushed.

Mr. Prouty also investigated the May 11th incident. Mr. Boring stated in an affidavit that at 7:30 a.m., he observed plaintiff rolling off the side of the road, and he told plaintiff to keep his roller on the road. Bryan Boyer, Brad Turnes, and Jeff Wells reported in their affidavits that at 7:45 a.m., they saw that plaintiff had driven his roller almost completely off the new asphalt on the road, where it was leaning badly into a ditch. Adam Dillon reported in his affidavit that he observed the roller go over the bank, and that plaintiff's head was down and he appeared to be asleep. Matt Shaeffer stated in his affidavit that plaintiff appeared to be having a very hard time staying awake, and that he could not hold a straight line with his roller and was going from side to side rolling down the road. Mr. Prouty also located the spots where the roller had gone off of the paving surface on May 11th, and he took photographs and videotape images of the scene.

Mr. Prouty concluded that plaintiff's inattentiveness and unsafe operation of the roller on May 10th and May 11th constituted multiple serious safety violations because they endangered plaintiff, fellow employees and the public, and created a

9

substantial probability that death or serious physical harm could have resulted.  He recommended that plaintiff be terminated.  He provided a written report the Safety Committee.  The Safety Committee concluded that plaintiff had committed two separate serious safety violations on May 10th and May 11th, and that his employment should be terminated in accordance with the provisions in the Safety Manual.  Defendant's Ex. D, Dennis Paul Aff.  Plaintiff was terminated on May 12, 2005.  Boring Aff., ¶ 8.

Plaintiff filed a complaint with the OCRC on June 23, 2005, alleging that his termination was due to race discrimination and retaliation.  On February 2, 2006, the OCRC issued a decision determining that no probable cause existed to believe that defendant engaged in discrimination and dismissing the charge.  Defendant's Ex. S.  The OCRC concluded that plaintiff was discharged due to repetitive safety violations, specifically, operating the asphalt roller in an unsafe manner, not due to race discrimination or retaliation.  The decision noted that defendant had discharged similarly situated Caucasian employees for the same reason, and that the OCRC's investigation failed to reveal a nexus between plaintiff's charges of discrimination and his termination.  The EEOC issued a right to sue letter.

Plaintiff also filed a grievance with the union contesting his termination.  Plaintiff and the union later entered into a settlement agreement with defendant which resolved this grievance.  Defendant's Ex. R.  Plaintiff and the union agreed to withdraw the grievance, and the union agreed not to dispatch plaintiff to any of defendant's work sites.  Plaintiff agreed to relinquish any rights to re-employment or reinstatement as an employee of the defendant

and its affiliates.   Plaintiff also agreed that he would not commence any actions in any forum against defendant arising out of or relating to the situation giving rise to the grievance, with the exception of litigating his EEO claims.   Defendant agreed to pay plaintiff back pay and fringe benefits for twelve days in May of 2005, and further agreed not to contest plaintiff's application for unemployment benefits.

II. Plaintiff's Claims

A. Intentional/Negligent Infliction of Emotional Distress

Defendant has moved for summary judgment on plaintiff's claim of intentional or negligent infliction of emotional distress. Plaintiff has not responded to this portion of defendant's motion for summary judgment, and has presumably abandoned this claim.

The elements of the tort of intentional infliction of emotional distress under Ohio law require plaintiff to prove: (1) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to plaintiff; (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. Yeager v. Local Union 20, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983); Pyle v. Pyle, 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (1983). Plaintiff must have suffered severe emotional distress and not just embarrassment or hurt feelings.   Reamsnyder v. Jaskolski, 10 Ohio

11

St.3d 150, 462 N.E.2d 392 (1984). Serious emotional distress is emotional injury which is both severe and debilitating. <u>Paugh v. Hanks</u>, 6 Ohio St.3d 72, 78, 451 N.E.2d 759 (1983).

Plaintiff has failed to produce evidence sufficient to raise a genuine issue of material fact on this claim. There is no evidence that defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community. There is also no evidence that plaintiff suffered severe emotional distress. For example, there is no evidence that plaintiff ever sought medical assistance for his alleged emotional distress. <u>See Davis v. Billow Co. Falls Chapel</u>, 81 Ohio App.3d 203, 208, 610 N.E.2d 1024 (1991)(dismissing emotional distress claim of plaintiff who never sought medical assistance). Plaintiff has pointed to no other evidence that he suffered severe emotional distress. <u>See Buckman-Peirson v. Brannon</u>, 159 Ohio App.3d 12, 25-26, 822 N.E.2d 830 (2004)(noting that plaintiff must present at least some evidence beyond her own testimony that she suffered severe emotional distress).

Plaintiff has also asserted a claim of negligent infliction of severe emotional distress. However, under Ohio law, that tort is confined to situations in which the plaintiff was a bystander to an accident and suffered serious emotional distress as a result of his proximity to the peril created by the accident. <u>See Kulch v. Structural Fibers, Inc.</u>, 78 Ohio St.3d 134, 163, 677 N.E.2d 308 (1997). Such circumstances were not present in this case.

Defendant is entitled to summary judgment on plaintiff's claim of intentional or negligent infliction of emotional distress.

B. Discrimination Based on Race and Color

1. Standards

Plaintiff has asserted claims of discrimination based on his race and color under Title VII, §1981, and §4112.02. Plaintiff alleges that he was terminated due to his race and color, while non-minority employees were not terminated for similar violations.

The framework for proving Title VII claims set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), also applies to employment discrimination claims brought under §1981. Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992). Like claims under Title VII, a claim under §1981 requires proof of intentional discrimination on the part of the defendant. General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375 (1982).

The Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to claims involving alleged violations of Chapter 4112. See Genaro v. Cent. Transport, Inc., 84 Ohio St.3d 293, 703 N.E.2d 782 (1999); Little Forest Medical Center of Akron v. Ohio Civ. Rights Comm., 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164 (1991).

A claim of discrimination may be proven by either direct or circumstantial evidence. Anthony v. BTR Automotive Sealing Systems, Inc., 339 F.3d 506, 514 (6th Cir. 2003); Byrnes v. LCI Communication Holdings Co., 77 Ohio St.3d 125, 128, 672 N.E.2d 145 (1996). To establish a discrimination claim based on circumstantial evidence, plaintiff must demonstrate a prima facie case in accordance with the guidelines set forth in McDonnell Douglas Corp. v. Green. Anthony, 339 F.3d at 514-15; Coryell v. Bank One Trust Co. N.A., 101 Ohio St.3d 175, 803 N.E.2d 781 (2004).

Plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence. <u>Anthony</u>, 339 F.3d at 514-15; <u>Omobien v. Ohio Civ. Rights Comm.</u>, 89 Ohio App.3d 100, 103-04, 623 N.E.2d 634 (1993). Once this prima facie case is established, the burden then shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its action. <u>Anthony</u>, 339 F.3d at 514-15; <u>Kohmescher v. Kroger Co.</u>, 61 Ohio St.3d 501, 503, 575 N.E.2d 439 (1991).

If the employer articulates such a reason, the plaintiff must show that the articulated reason was merely a pretext for discrimination. <u>Anthony</u>, 339 F.3d at 514-15; <u>Kohmescher</u>, 61 Ohio St.3d at 503-04. A plaintiff can demonstrate pretext by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. <u>Manzer v. Diamond Shamrock Chemicals, Co.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994); <u>Carney v. Cleveland Hts.-Univ. Hts. School Dist.</u>, 143 Ohio App.3d 415, 429, 758 N.E.2d 234 (2001). The ultimate burden of proof that the defendant intentionally discriminated against the plaintiff remains at all times on the plaintiff. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993).

To establish a prima facie case of disparate treatment under <u>McDonnell Douglas</u>, plaintiff must show: (1) that he is within a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that similarly-situated non-minority employees were treated more favorably. <u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605, 610 (6th Cir. 2002); <u>Koski v. Willowwood Care Center of Brunswick, Inc.</u>, 158 Ohio App.3d 248,

252, 814 N.E.2d 1235 (2004); <u>Ferguson v. Lear Corp.</u>, 155 Ohio App.3d 677, 683, 802 N.E.2d 1141 (2003).

To be similarly situated, exact correlation is not required, but the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in "all of the relevant aspects." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998)(quoting <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994)).   The non-minority employees must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.  <u>Ercegovich</u>, 154 F.3d at 352; <u>Kroh v. Continental Gen. Tire, Inc.</u>, 92 Ohio St.3d 30, 31, 748 N.E.2d 36 (2001).

<u>2. Termination Claims</u>

Plaintiff claims that his terminations in 2003, 2004 and 2005 were due to a discriminatory motive.  Defendant argues that plaintiff has failed to establish a prima facie case of discrimination.  Plaintiff has shown that he is a member of a protected class and that he suffered an adverse employment action. However, defendant contends that plaintiff has failed to produce evidence that similarly-situated non-minority employees were treated more favorably.

Mr. Paul stated in his deposition that, on average, one or two employees are terminated each year for safety violations.  Paul Dep., p. 22.  Defendant has presented evidence that Caucasian employees have been terminated for safety reasons.  <u>See</u> Paul Aff., ¶ 3; Prouty Aff., ¶3.   One example provided by Mr. Paul was the

termination of Rick Kessler in 2005.  Paul Aff., ¶ 3.

Plaintiff contends that Caucasian employees were treated more favorably.  He testified at his deposition that Kenny Schneider turned over a Rosco broom doing doughnuts in a parking lot but was not terminated.  Plaintiff's Dep., p. 146.  However, he was unaware of any other safety violation by Schneider, and he did not know who supervised Schneider.  Plaintiff's Dep., pp. 146, 150.  Plaintiff was terminated in 2003 for driving into traffic with his roller three times and for sexual harassment, and was terminated in 2005 for serious safety violations.  The evidence is insufficient to show that plaintiff's violations were similar to the Schneider incident.  Plaintiff also testified that a female employee told him that she had broken her wrist when her roller went into a ditch and tipped over.  Plaintiff's Dep., p. 147.  This hearsay evidence is not admissible in summary judgment proceedings.  U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997); Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996).  In addition, plaintiff's testimony fails to show that the incident was similar to his own safety violations.  Plaintiff stated that he was unaware of the circumstances of this incident, and that female employee had a different supervisor.  Plaintiff's Dep., pp. 149-150.

Plaintiff has submitted forms recording safety violations by other employees.  However, these forms do not indicate the race of the employees named on the forms.  Plaintiff relies on his affidavit, in which he states that he was generally the only African-American machine operator on the job site.  From this fact, he argues that the employees named in the forms must be Caucasian.  However, the evidence indicates that defendant operates fifteen

asphalt plants which produced over 1,200,000 tons of asphalt in 2005, which was used by defendant's construction crews and other contractors to pave more than one thousand miles of roads. Sharrett Aff., ¶ 2.  The fact that plaintiff was usually the only African-American machine operator at his particular job site does not establish that all of the other employees named in the forms were Caucasian.

In addition, the forms fail to establish that all of the employees who received some form of discipline short of termination were similarly situated to plaintiff.  The safety violation forms do not show that these employees had the same supervisor as plaintiff.  The safety forms also reflect a wide variety of dissimilar safety violations, both "serious" and "other than serious."  These violations range from violations as minor as failing to wear a seatbelt or helmet while operating machinery to vehicular collisions.

In addition, the vast majority of these forms reflect only one violation by the employee.  Under the terms of the Safety Manual, two serious violations in the same calendar year automatically result in termination.  Plaintiff's termination in 2003 occurred after he drove his roller into the moving traffic lane three times. His termination in 2005 occurred after he came close to colliding with the vehicle on which his foreman was riding, and, the next day, let his roller slide over the edge of the pavement into a ditch.  Plaintiff's violations consisted of more than one "serious" violation.  The case most similar to plaintiff's situation was that of Willie Shaw, who backed his roller out into the traffic lane, and a few weeks later moved his roller into the traffic lane.  The

forms reveal that Mr. Shaw's employment was terminated on the second violation.  The forms submitted by plaintiff fail to show that other non-minority employees were treated more favorably in situations similar to plaintiff's violations, or to raise a genuine issue of fact in that regard.

Plaintiff has also produced no evidence that non-minority employees accused of sexual harassment are treated more favorably by defendant.  Defendant maintains comprehensive policies which prohibit all forms of unlawful harassment and discrimination. Gales Aff., ¶ 2.  Defendant notes that Ms. Gales, the EEO Director who conducted the investigation into the sexual harassment allegations against plaintiff, is African-American.

In regard to plaintiff's termination in 2004, when he was asked to leave because of the pending arbitration, plaintiff has produced no evidence that previously terminated Caucasian workers with pending arbitrations were permitted to return to work.

Even assuming that plaintiff has shown a prima facie case, defendant has articulated legitimate, nondiscriminatory reasons for the adverse job actions.  Defendant has presented evidence that in 2003, plaintiff drove his roller off of the new asphalt surface and into the moving traffic lane on three occasions, causing drivers to apply their brakes in order to avoid a collision with the roller. Defendant has also presented evidence that a female employee complained that plaintiff made comments of a sexual nature in violation of defendant's policy against sexual harassment.  Candace Gales, defendant's EEO Director, conducted an investigation into the complaints and concluded that plaintiff's actions towards two female employees violated defendant's prohibition on creating a

18

sexually hostile work environment.

The evidence reveals that defendant had an honest belief that plaintiff's termination in 2003 was warranted.  Under the "honest belief" rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.  Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001).  An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made.  Id.; Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001).  Here, defendant relied on the statements of Mr. Cooperrider, the foreman on the job who reported the safety violations, and the information provided by Ms. Gales, who interviewed the female employees.

In response, plaintiff states in his affidavit that he "denies that his behavior and conduct warranted either allegation." However, such conclusory statements constitute no more than a statement of opinion which is insufficient to raise a genuine issue of fact.

Plaintiff also attacks the sufficiency of the investigation conducted by Ms. Gales. He claims that he was never interviewed by Ms. Gales.  However, Ms. Gales was unable to speak with plaintiff on May 14, 2003, because she was on her way out of town to one of defendant's other companies; she planned to speak with him the following Monday.  Gales Aff., ¶ 3; Report of July 25, 2003.  Ms. Gales turned over her preliminary findings to Paul Rice,

defendant's general counsel, and the decision was made to terminate plaintiff's employment on May 16, 2003. Ms. Gales testified in her deposition that when she attempted to speak with plaintiff about the allegations on the following Monday, after his termination, he refused to discuss them and indicated that he was going to file a charge with the OCRC. Gales Dep., pp. 46-47.

Plaintiff also notes that Ms. Gales' report was completed two months after his termination on May 16, 2003. The written report dated July 25, 2003, was prepared as a response to plaintiff's charge filed with the OCRC. The fact that this report was not prepared until after plaintiff's termination does not undermine the validity of the findings discussed in the report. If anything, the fact that Ms. Gales continued her investigation even after plaintiff's termination indicates that the company was concerned about conducting a full investigation. In this instance, Ms. Gales was satisfied that her further investigation confirmed her initial findings. Plaintiff has produced no evidence to show that defendant acted unreasonably or in bad faith in relying on the reports of sexual harassment in terminating plaintiff's employment.

Plaintiff also claims that he was terminated in 2003 based on one safety violation, contrary to the provisions of the Safety Manual. Even assuming that driving into the traffic lane three times constituted a single violation, plaintiff's termination was not in violation of the Safety Manual, which provides that an employee's supervisor "has the discretion to discharge the employee after any safety violation." (Emphasis supplied). Safety Manual, Section X. Further, plaintiff's termination in 2003 was based not only on the safety violation(s) but also on the complaints of

20

sexual harassment.

Plaintiff states in his affidavit that he was not interviewed following the 2003 or 2005 safety violations. However, he has produced no evidence as to what he would have told the company's investigators which may have changed the decisions to terminate his employment.

Plaintiff also argues that the decision of the arbitrator on his grievance should be dispositive of his discrimination claim regarding his 2003 termination. However, in a civil rights action, this court may not give a res judicata or collateral estoppel effect to an arbitration proceeding brought pursuant to the terms of a collective bargaining agreement. McDonald v. West Branch, Michigan, 466 U.S. 284, 292 (1984). This is because "an arbitrator's expertise 'pertains primarily to the law of the shop, not the law of the land.'" Id., quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 57 (1974). Other reasons for not according an estoppel effect to the arbitrator's decision are: (1) the arbitrator's authority, derived from the collective bargaining agreement, does not extend to the enforcement of the civil rights statutes; (2) the union has exclusive control over how a grievance is presented; and (3) arbitral factfinding is generally not equivalent to judicial factfinding. Id. at 290-91.

Here, plaintiff's allegations of discrimination were not before the arbitrator or decided by him. The arbitrator basically held that since plaintiff's conduct did not reach a level necessary to constitute a hostile work environment, as defined under Title VII case law, termination was not the appropriate sanction under the applicable collective bargaining agreement. However, under

21

Title VII, an employer has a duty to ensure that its employees are not subject to unwanted sexual harassment.  If that harassment is permitted to continue to the point where it creates a hostile work environment, this would expose the employer to liability under Title VII.  Even though the arbitrator in this case disagreed that termination was an appropriate sanction under the collective bargaining agreement, the fact that defendant terminated plaintiff's employment in reliance on the sexual harassment complaints of its female employees before plaintiff's conduct arose to the level of a hostile work environment is not sufficient to raise an inference that his termination was a pretext for race or color discrimination.  Further, even if the arbitrator's decision is considered, the arbitrator did not find that plaintiff was totally without fault; he concluded that plaintiff's record should reflect a reprimand for operating his roller in moving traffic.

In regard to plaintiff's termination in 2004, defendant has presented evidence that plaintiff was terminated in May of 2004 because he was considered ineligible to work due to the pending grievance.  Since the grievance was pending, defendant considered plaintiff to be a terminated employee who was not eligible for employment at that time.  Sharrett Aff., ¶ 7.  When plaintiff reported to the job site, the foreman, David Gentil, was unaware of the pending arbitration, and therefore plaintiff was permitted to work for two days until this fact was discovered.  Gentil Aff., ¶ 3; Paul Dep., p. 45.  Mr. Gentil then notified plaintiff that he was not eligible to work on defendant's job site at that time.  Gentil Aff., ¶ 4.  In defendant's response to plaintiff's interrogatories, defendant stated that plaintiff "was sent back to

the union hiring hall based on the company's understanding that his separation from employment was to remain in effect unless and until the results of the March 2004 [arbitration hearing] dictated otherwise."  The arbitrator's decision was not rendered until December of 2004.

Plaintiff states in his affidavit that he was told that he was "unfit to work at Shelly."  Such hearsay evidence is inadmissible in summary judgment proceedings.  Even if it is considered, the term "unfit" is ambiguous and could have many meanings.  It has no obvious racial connotation.  Additionally, plaintiff states in his affidavit that he was sent to defendant's job site in 2004 because defendant called the union hall and requested a minority operator.  This information contradicts plaintiff's claim that defendant terminated plaintiff's employment two days later due to his race or color.

Plaintiff also argues that in response to his request for production of documents, he received no document which reflected any policy of not permitting employees with a pending arbitration to return to work.  However, General Manager Sharrett testified in his deposition that "we don't bring back terminated employees."  Sharrett Dep., p. 45.  Plaintiff has produced no evidence to show that defendant did not in fact have such a policy.

Plaintiff also notes the provision in the Safety Manual which states that re-employment of employees terminated for safety violations "may be considered one year after termination."  Safety Manual, Section X.  Since he was re-hired and worked for two days, plaintiff apparently, albeit mistakenly, received the benefit of that section.  However, he has introduced no evidence to show that

the re-employment provision in the Safety Manual has been applied in the case of previously terminated employees with a pending arbitration, particularly where the previous termination was based not only on safety violations, but also on sexual harassment grounds.  Plaintiff's arguments are insufficient to establish that plaintiff's termination in 2004 was a pretext for discrimination.

In regard to plaintiff's 2005 termination, defendant has offered evidence of the investigation conducted into reported safety violations committed by plaintiff on May 10, 2005, and May 11, 2005.  On May 10th, plaintiff ran his roller to within inches of where his supervisor was standing.  Defendant has offered evidence from Mr. Boring and other witnesses that plaintiff's ten-ton roller picked up speed and came within inches of the platform where Mr. Boring was standing.  Mr. Boring stated in his affidavit that if the roller had come a few inches closer, he could have been killed.  Boring Aff., ¶ 5.

Plaintiff does not deny that this occurred, but states in his affidavit that it was a "minor incident for which he did not even receive a verbal warning."  Plaintiff's opinion that this was a "minor incident" is not sufficient to create a genuine issue of fact.  The mere fact that plaintiff disagreed with his supervisors' assessment of the severity of the violation is not enough to show pretext.  Plaintiff did not receive a formal warning that day because Mr. Boring was still shaken up by the incident.  Boring Dep., p. 12.  No investigation was conducted that day since the project was in a remote area and the work day was almost over.  Boring Aff., ¶ 6.

Defendant has also presented evidence from witnesses who

24

observed plaintiff drive his roller off the pavement and down an embankment on May 11th.  Plaintiff stated in his affidavit that he does not deny that he became distracted and allowed his roller to run off of the road.  He admitted at his deposition that he took his attention away from the roller to get something out of his lunch box.  Plaintiff's Dep., pp. 133-134.  He agreed that going off the roadway was a serious safety offense.  Plaintiff's Dep., p. 141.

Safety Representative Drake Prouty conducted an investigation of the incidents on May 10th and May 11th.  He interviewed witnesses and took photographs of the marks on the pavement where the roller ran off the road.  The evidence indicates that defendant terminated plaintiff's employment after a thorough investigation of the incidents, with the honest belief that plaintiff had committed two serious safety violations.

Plaintiff argues that defendant wanted to be rid of him, and that therefore defendant's motive must be discriminatory.  He cites as evidence a discussion between plaintiff and Mr. Sharrett in early 2005 concerning a proposed severance agreement which would have given plaintiff a separation payment in exchange for plaintiff agreeing to sever ties with the company, much like the settlement agreement which resolved plaintiff's 2005 grievance. However, this is not evidence of a discriminatory motive.  Mr. Sharrett offered a lump sum settlement to plaintiff as an alternative to the arbitrator's award if plaintiff decided that he did not want to return to work for the company.  Sharrett Dep., p. 33.  Mr. Sharrett indicated that he was willing to honor the arbitrator's decision, and that it was plaintiff's decision whether he wanted to

return; Mr. Sharrett had no personal or professional preference in the matter.  Sharrett Dep., p. 35.  These circumstances do not support an inference that defendant's actions were based on plaintiff's race or color.

3. Conclusion

Plaintiff has failed to produce sufficient evidence to establish a prima facie case of discrimination.  Defendant has proffered legitimate, nondiscriminatory reasons for plaintiff's terminations, and plaintiff has failed to show the existence of a genuine issue of fact on the question of pretext.  Defendant is entitled to summary judgment on plaintiff's claims of discrimination in his terminations.

C. Retaliation

Plaintiff also asserts retaliation claims under Title VII and Ohio Rev. Code §4112.02(I).  Plaintiff claims that his terminations in 2004 and 2005 were in retaliation for his filing charges of discrimination.  To establish a prima facie case of retaliation, plaintiff must prove that: (1) he engaged in protected activity; (2) this exercise of protected rights was known to the employer; (3) the employer thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Ford v. General Motors Corp., 305 F.3d 545, 552-53 (6th Cir. 2002); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000); Peterson v. Buckeye Steel Casings, 133 Ohio App.3d 715, 727, 729 N.E.2d 813 (1999).

Once the plaintiff demonstrates the above elements, the employer must then articulate a legitimate, nondiscriminatory

26

reason for its action.  Wrenn v. Gould, 808 F.2d 493, 501 (6th Cir. 1987); Peterson, 133 Ohio App.3d at 727.  If the employer does so, then the burden shifts back to the plaintiff to show that the articulated reason was a pretext for discrimination.  Id.

To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action. E.O.C. v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997). A causal connection may be shown by direct evidence or by evidence of the employer's knowledge of the complaints coupled with a closeness in time sufficient to create an inference of causation. Wrenn, 808 F.2d at 501.  Temporal proximity alone is ordinarily not sufficient to establish causation in the absence of additional evidence to support a finding that the protected activity and the adverse action were connected.  See Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999)(no inference of causation where the disciplinary actions occurred two to five months after filing of charges); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986)(mere fact that discharge occurred four months after filing of discrimination charge insufficient to support inference of retaliation); Neal v. Hamilton County, 87 Ohio App.3d 670, 678, 622 N.E.2d 1130 (1993)(alleged retaliatory action must follow protected activity sufficiently close in time to warrant an inference of retaliatory motivation).

Plaintiff's first OCRC charge was filed on May 19, 2003, and the OCRC charge was dismissed with a finding of no probable cause on February 19, 2004.  Plaintiff's employment was terminated in

June of 2004, over a year after the filing of his OCRC charge.
Plaintiff's second OCRC charge was filed on August 16, 2004, and
the OCRC charge was dismissed with a finding of no probable cause
on April 14, 2005.  Plaintiff's employment was terminated on May
12, 2005, almost nine months after the filing of his second OCRC
charge.  Thus, the circumstances are insufficient to support an
inference of retaliation based on mere temporal proximity.

Plaintiff seeks to bolster his retaliation claim by submitting
the affidavit of Danielle Saunders, who testified at plaintiff's
arbitration proceeding.  Ms. Saunders stated that after her
testimony at the arbitration proceeding, defendant only called her
to work for a few weeks in 2004 and not at all in 2005.  Plaintiff
essentially argues that this indicates that defendant retaliated
against Ms. Saunders for testifying on plaintiff's behalf at the
arbitration hearing, and therefore defendant must also have
retaliated against him for filing the OCRC charges.

Aside from the fact that a finding of retaliation against Ms.
Saunders for testifying at plaintiff's arbitration hearing would
not necessarily give rise to an inference of retaliation against
plaintiff for filing his OCRC charges, the evidence presented is
insufficient to permit an inference that defendant retaliated
either against Ms. Saunders or, by extension, against plaintiff.
Ms. Saunders did not engage in activity protected under Title VII
or §4112.02 by testifying at the arbitration hearing.  There is no
evidence that she testified before the OCRC in regard to
plaintiff's charges.  Thus, her lack of employment with defendant
cannot reasonably be attributed to her engaging in protected
conduct, because she did not engage in conduct protected under

Title VII or § 4112.02.

The evidence is also insufficient to establish that Ms. Saunders' lack of employment with defendant was due to retaliation for any reason. There is evidence that defendant's employees are referred by the local union halls. Thus, the failure to refer Ms. Saunders for work may be attributable to the union. There are other possible explanations for the fact that Ms. Saunders did not work for defendant in 2005, such as the lack of road repaving projects in her area or the referral of other union employees who took precedence on the referral list. There is no evidence that other available, similarly-situated employees who did not testify at plaintiff's arbitration hearing were employed by defendant in 2004 and 2005, while Ms. Saunders was not.

As noted above, defendant has proffered legitimate, nondiscriminatory reasons for plaintiff's terminations in 2004 and 2005. The evidence is insufficient to raise a genuine issue of fact on the question of pretext.

Based on the evidence presented, no finder of fact could reasonably conclude that defendant terminated plaintiff's employment in 2004 and 2005 in retaliation for filing OCRC charges. Defendant is entitled to summary judgment on plaintiff's retaliation claims.

D. Requests for Reinstatement, Lost Wages and Punitive Damages

Defendant argues that plaintiff's prayer for reinstatement and lost wages is barred by the settlement agreement resolving his 2005 grievance. Defendant also argues that the evidence does not support an award of punitive damages. In light of the court's conclusions that defendant is entitled to summary judgment on

29

plaintiff's claims, these arguments are moot.

<u>III. Conclusion</u>

In accordance with the foregoing, defendant's motion for summary judgment is granted. The clerk is directed to enter judgment in favor of the defendant on plaintiff's claims.

Date: December 11, 2006        s\James L. Graham
                                James L. Graham
                                United States District Judge